Terri Wood, OSB #883325
Law Office of Terri Wood, P.C.
730 Van Buren Street
Eugene, Oregon 97402
541-484-4171
Fax: 541-485-5923
Email: contact@terriwoodlawoffice.com

Attorney for Jon Ritzheimer

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>-VS-<br><br>JON RITZHEIMER,<br><br>        Defendant | Case No. 3:16-CR-00051-02-BR<br><br>DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO PRETRIAL RELEASE |

Defendant, Jon Ritzheimer, through counsel Terri Wood, respectfully submits the following Reply to the Government's Response in Opposition to his Supplemental Motion and Memorandum for Pretrial Release (hereafter "Response").

Defendant's "negotiation" of self-surrender, Response page 2 & n.1

Mr. Ritzheimer was indeed arrested by the FBI upon self-surrender. The Government portrayed this to be the result of protracted "negotiations" when it sought detention in Arizona; and continues to infer his surrender was achieved only through "negotiation." There was a 20 minute phone conversation between

DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE      Page 1

him and a local police detective where Mr. Ritzheimer was first informed of the federal arrest warrant, asked if he could surrender in the morning, and when told no because FBI agents were already there, reached agreement to come to the station that evening. His Facebook post was made after this conversation.

<u>Defendant's "history of mental health issues" as cause for detention, Response page 2.</u>

Mr. Ritzheimer has combat-related PTSD, diagnosed as arising in 2005-06. This was prior to his second tour of duty in Iraq. His PTSD did not impair his performance in defense of our country, see letters from men who served with him in combat in 2007-08, Exhibit 101 filed with the defense release memorandum. His PTSD did not impair his continued service in the Marine Corp Reserves through honorable discharge in 2014. That is his "history of mental health issue."

<u>Defendant's "urinalysis test was positive for marijuana" as cause for detention, Response page 2.</u>

At the time of his arrest in Arizona, Mr. Ritzheimer held a valid Medical Marijuana card and had been using a marijuana product as an alternative to VA prescribed drugs. He understands and agrees that he cannot use medical marijuana while on pretrial release.

<u>Defendant "was one of the leaders of the armed takeover" at the Refuge as cause for detention, Response page 3.</u>

This is the Government's view, not shared by the defense. Mr. Ritzheimer did participate in the protest that occurred at the Refuge, and he did exercise his First and Second Amendment rights while there. Whether his conduct crossed the line of illegality as alleged by the Government awaits determination at trial.

According to news reports, on December 30, 2015, BLM employees were nearing the end of their workday at the Refuge when management told them to go home early and, for their safety, not return to work until instructed. News reports also reflect concerns by the Bundy protestors—prior to the occupation on January 2nd—that the FBI viewed them as terrorists and would use deadly force rather than negotiate with the protestors. MNWR_1277-78.[1] Given this belief, many including Ritzheimer carried firearms for defense against deadly force they feared law enforcement would deploy. The "Standing Operating Procedure for the refuge was 'not to engage unless engaged,'" MNWR_1510.

The news media reported Harney County Sheriff Ward immediately told the occupiers to "Go Home," a sentiment expressed by hundreds of community members. But Bundy refused to break camp, saying occupiers would not leave until the federal refuse lands were given back to local control and the Hammonds were released. By early February, mainstream media reported, "Now, many who criticized Bundy and Payne's takeover have begun to voice support, even admiration, for the amount of attention the occupation has brought to the underlying grievances. Occupiers have received increasing local support and supplies and gained international headlines. U.S. Rep. Greg Walden, R-Ore., delivered an emotional shout-out on the House floor." MNWR_1279.

<u>Defendant's membership in Operation Mutual Defense, Response page 3.</u>

The Government states, "According to the group's website, defendant is also a member of the Advisory Board of Operation Mutual Defense, a militia group." Id.

---

[1] MNWR_1277-78 denotes the Bates number(s) of pages from the Government's discovery, placeholder zeros omitted.

DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE                               Page 3

Operation Mutual Defense ("OMD") is not a militia group per se. "OMD is a network of Militias that also includes concerned citizens, local patriots, journalists, and media relations personnel from patriotic political activism groups." http://www.operationmutualdefense.org/mission_statement.htm It consists of a 7-member advisory board and volunteers. It screens requests for action, and decides which requests warrant a "call out" for supporters and volunteers. http://outpost-of-freedom.com/blog/?p=1331

Mr. Ritzheimer served on the advisory board for a few months prior to the Burns protest.

> Defendant "used his military training to organize the recruits into groups" and "conducted training exercises and drills," Response page 6.

According to the post-arrest interview of a co-defendant, Ritzheimer "wasn't involved in tactical training and sometimes worked as a 'gopher,' picking up mail, taking meals to the men who were otherwise disposed. He also served in personal security details, as he escorted the Bundys to their press conferences and other meetings." MNWR_1508. "Ritzheimer helped keep everyone in check and explained what to do if they were ever engaged. [He] described [Ritzheimer] as 'level-headed,' except for one time when he erupted after receiving numerous sex toys in the mail. If one of the occupiers had never handled a weapon, Ritzheimer ensured they were not allowed to use any of the weapons." Id.

As previously noted, the protestors, including Mr. Ritzheimer, feared that the government would respond to the sit-in at the Refuge with excessive and deadly force.

> Defendant's role in "a sustained armed occupation of a public area . . . intended to prevent federal employees from accessing their workplace," Response page 8.

Mr. Ritzheimer's and others professed intent was to exercise their First Amendment rights and thereby draw public attention and increase public

pressure on federal government officials to take action to commute the Hammonds' prison sentences and to restore public lands to local control.

Mr. Ritzheimer did stand guard outside the gate to the Refuge, but only to perform a screening function to keep things peaceful. According to one citizen interviewed by the FBI, "if you arrived [at the Refuge] and wanted to walk in, the guard would usually wave you through. If you arrived in a truck and wanted to drive in, the guard would quiz you about why you were there and what you wanted." MNWR_1389. Members of the general public and news media, as well as protestors and counter protestors, frequently came and went. One witness interviewed by the FBI, present inside the Refuge around January 9th, "had difficulty counting the number of people on the NWR because of the number of media representatives on the NWR while [he] was there." MNWR_1044.

<u>Defendant's "role in the offense . . . was marked by persistent defiance of the orders of local and federal law enforcement," Response page 9.</u>

Mr. Ritzheimer's interactions with law enforcement have always been peaceful. He regularly responded to inquiries from local and federal agents in Arizona regarding his protest activities, including inviting them into his home. When advised he could not spend the night with his family and surrender in the morning because the FBI was at the station waiting, he came that night.

A sheriff's deputy told the FBI about Ritzheimer, Ammon Bundy and other co-defendants attending a community meeting at the high school on the evening of January 19th. He attributed no threats or misconduct to Mr. Ritzheimer, who remained when most others in his group left the meeting upon hearing a rumor that the FBI was going to attempt to arrest Bundy. MNWE_1159-60.

Mr. Ritzheimer had regular, peaceful interactions with law enforcement while participating in the protest, according to FBI reports in discovery: On

DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE                                    Page 5

January 17th at approximately 10 p.m. Ritzheimer and three others from the protest group visited sheriffs deputies maintaining a barricade near the Harney County Courthouse. Jason Patrick questioned sheriff deputies about a Bearcat armored vehicle they thought was being stored nearby, and started walking towards the building. When called back by a deputy and told the area was not open to the public, Patrick apologized. Ritzheimer "extended the conversation regarding the Bearcat by adding that they did not want a war and don't want anyone hurt, but that they were prepared to fight if necessary." MNWR_1161.

On January 23rd at approximately 5:15 pm, Ritzheimer and Ryan Payne came to the Command Post (CP) in Burns and spoke with FBI special agents. Ritzheimer stated "they have come to the CP every couple of days to try and talk about the United States Constitution." Payne did most of the talking. Both he and Ritzheimer said their group was seeking redress of grievances [the Hammonds' sentences and federal takeover of public lands], and "said they were prepared to stay a long time [at the Refuge] before a resolution could be reached." Ritzheimer requested that the FBI contact him directly to discuss the situation. They departed without incident. MNWR_1174-75.

Mr. Ritzheimer later departed from the protest of his own accord and without incident, before any resolution of the grievances was reached.

"Defendant has no ties to Oregon," Response page 9.

Mr. Ritzheimer has family in the Portland area who are willing to house him for the duration, along with his wife and children. Specifics of this alternative and less-favored release plan have been provided to Pretrial Services. This was stated in the defense release memorandum, pages 4-5.

<u>Defendant's alibi for the December 18th Safeway confrontation could be invalid if the complainant simply made an error as to the date, Response page 10, n.2</u>

The possibilities of a mistaken date or a misidentification are less likely than the citizen made a false complaint. The FBI report states the citizen "immediately recognized one of the males as Blaine Cooper and the second male as John (sic) Ritzheimer." The citizen then goes on to describe a disturbing incident that occurred "sometime during the week of December 21, 2015," which was the week of Christmas, that she thought "had something to do with the incident at the Safeway a few days prior." MNWR_951. With Christmas as a marker to help place dates, and speaking with the FBI a short time later (on or before January 4th) it is unlikely the citizen would be confused about the Safeway incident happening on approximately December 18th, i.e., during the week before Christmas.

<u>Defendant's "disdain for the law" and "declared intention to take the law into his own hands," as cause for detention, Response pages 9-11.</u>

On these pages of its Response, the Government portrays Mr. Ritzheimer's law-abiding protest activities regarding Schuyler Barbeau and Senator Stabenow as actions "to arrest a United States Senator for voting in Congress" and "to free a defendant facing federal charges." That blurs the critical distinction between assembly with others to advocate action—protected by the First Amendment—from incitement to imminent lawless action. *See, Brandenburg v. Ohio*, 395 US 444 (1969).

Mr. Ritzheimer discussed his protest activities on Mr. Barbeau's behalf with the FBI prior to department for Seattle. He and others held a non-violent rally, then he quietly observed the court proceedings, and once outside the courthouse, spoke with the press.

Mr. Ritzheimer's protest activities related to Sen. Stabenow were addressed in his release memorandum. The Government's "belie[f] that defendant did not travel to Michigan because he was unable to secure funding for the trip," Response page 11, is inaccurate. Mr. Ritzheimer did further research into obtaining an indictment for her arrest, and concluded that a lawful indictment could only be obtained from grand jury proceedings conducted by the government. He believed no government prosecutor would work with him to secure an indictment, so there was no reason to go to Michigan.

<u>Defendant "poses a significant danger to the community" due to his history of public protests, Response page 11.</u>

In contrast with the recent rallies of one presidential candidate, who according to news reports has fueled supporters' feelings of "righteous rage against a corrupt political and economic system," Mr. Ritzheimer's past protests have not led to violence.

As a Marine, Mr. Ritzheimer risked his life to protect and preserve the very freedoms that the Government now condemns him for exercising. His past protests did not cross the line from constitutionally protected conduct to illegal conduct. He is presumed innocent of the charges arising from his last act of protest in Burns. He will follow all restrictions and conditions imposed as conditions of release, and should be granted release pending trial.

DATED this 16th day of March, 2016.

/s/ Terri Wood
TERRI WOOD  OSB  883325
Attorney for Ritzheimer