Per C. Olson, OSB #933863
HOEVET OLSON HOWES, PC
1000 SW Broadway, Suite 1500
Portland, Oregon 97205
Telephone: (503) 228-0497
Facsimile: (503) 228-7112
Email: per@hoevetlaw.com
    Of Attorneys for Defendant Fry

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>DAVID LEE FRY,<br><br>        Defendant. | Case No. 3:16-CR-00051-13-BR<br><br>MEMORADNUM IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL PRODUCTION OF THE INVESTIGATION OF FBI USE OF FORCE AND COVER-UP IN THE FINICUM SHOOTING |

Defendant David Fry, through his attorney Per C. Olson, and on behalf of all defendants, submits this Memorandum in Support of Defendant's Motion to Compel Production Of the Investigation of FBI Use of Force and Cover-Up in the Finicum Shooting. Defendants seek production of all reports developed in the investigation by the United States Department of Justice, Office of Inspector General, and by the Tri-County Major Incident Team, into members of the FBI Hostage Rescue Team present at the shooting death of LeVoy Finicum on January 26, 2016.

The Office of Inspector General (OIG) is investigating members of the FBI Hostage Rescue Team (HRT) for lying to crime-scene investigators about their involvement in the shooting incident and for tampering with evidence. The defense believes that the Tri-County Major Incident Team also is continuing its investigation into this aspect of the Finicum death. As amplified in this memorandum, the defense seeks discovery of the OIG and Tri-County investigation materials for the following reasons:

Page 1 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

1. The evidence is relevant to show the FBI's institutional bias and animosity against defendants who oppose and speak out against government corruption and overreach;
2. The evidence is relevant to establish the bias and animosity of the HRT operators directly involved in the shooting and subsequent cover-up;
3. In the context of the HRT's history of use of excessive force and cover-ups (*e.g.,* Waco and Ruby Ridge), the Finicum shooting and cover-up is directly relevant to explain and corroborate that defendants possessed or carried firearms as alleged in the indictment for defensive purposes and in fear of a covert FBI attack, rather than to facilitate the alleged conspiracy or for offensive reasons.
4. The FBI's use of excessive force and its cover-up is directly relevant to explain and corroborate the claim by David Fry and the other defendants who remained at the refuge after January 26 that they possessed firearms in response to the shooting and because they feared a similar violent and covert attack by the FBI.
5. The OIG investigation also is relevant because it is an extension of the arrest reports of defendants Shawna Cox and Ryan Bundy. These defendants are entitled to know why an FBI agent shot at them and then covered it up.

**Facts**

On January 26, 2016, law enforcement officials from the FBI HRT and the Oregon State Patrol (OSP) conducted a high-risk traffic stop of several defendants traveling in two vehicles northbound on Highway 395 from Burns to John Day, Oregon. The logistics of the stop were planned out ahead of time in several meetings in Bend and Burns. FBI HRT commanded and controlled the operation. FBI HRT operators were placed in vehicles with OSP troopers engaged in the stop. Also, FBI HRT operators and OSP troopers set up a roadblock using law enforcement vehicles at the

Page 2 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

north end of a containment area to block traffic coming from the north and to prevent the defendants' vehicles from evading the traffic stop.

By way of background, the FBI HRT is a federal SWAT team of about 90 "operators" nationwide who perform counter-terrorism operations (which this was not), hostage rescue operations (which this was not), high-risk manhunts (which this was not), and similar activities.  Apparently, it also oversees high risk traffic stops when it feels that local law enforcement is not sufficiently trained or equipped for such an operation.  Its equipment and tactics are the most advanced of the FBI's regular and enhanced SWAT teams.  Its capabilities are "distinguished" because the HRT operators serve full time and train daily in "assault and sniper teams."[1]

The HRT has a history of excessive force and cover-ups.  During the Ruby Ridge siege of 1992, an FBI HRT sniper, following the rules of engagement drawn up for the operation, shot Randy Weaver when he was not posing a threat, and shot and killed Randy's wife, Vicki, while she was standing, unarmed, in the doorway to the cabin holding her baby.[2]  The incident led to a Senate investigation and report concluding that the rules of engagement – that allowed for the killing of Weaver or any armed adult standing near Weaver regardless of threat – were unconstitutional.  The incident also led to the conviction of an FBI executive for obstruction of justice for destroying all copies of an internal report critical of the bureau's handling of the siege.[3]

The FBI HRT also was involved in the siege of the Branch Davidian compound near Waco, Texas, in 1993.[4]  The FBI engaged in increasingly hostile and aggressive techniques to force the occupants from the compound, including use of sleep deprivation techniques (blasting all-night recordings of jet engines, bad pop music, and

---

[1] See https://en.wikipedia.org/wiki/Hostage_Rescue_Team
[2] See https://en.wikipedia.org/wiki/Ruby_Ridge#Aftermath
[3] See http://www.cnn.com/US/9610/30/ruby.ridge/
[4] See https://en.wikipedia.org/wiki/Waco_siege#Siege

Page 3 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON  97205
(503) 228-0497

the screams of rabbits being slaughtered); the use of armored vehicles to destroy the Davidians' vehicles parked outside the compound and to tear down perimeter fencing and outbuildings; repeatedly driving over the grave of a deceased Davidian; and cutting water and power supply to the compound. The government's final assault with armored vehicles and tear gas caused the Davidians to set fire to the compound, resulting in the deaths of 76 men, women and children. The FBI falsely claimed for many years that it did not use pyrotechnic devices in the raid. Its admission in 1999 that fire-starting devices were, in fact, deployed in the assault caused 61 percent of the public to believe that federal agents started the fire that killed the occupants.

These events are indelibly etched into the minds of defendants and like-minded people who speak out against various forms of government overreach, aggression, and corruption.

Returning to the case at hand, on January 26, law enforcement stopped the vehicle containing Ammon Bundy and Brian Cavalier; and they were taken into custody without incident. The pick-up truck driven by LaVoy Finicum came to rest some distance from the initial stop of the Bundy/Cavalier vehicle. Also in the pick-up with Finicum were defendant Ryan Payne (front passenger seat), defendant Ryan Bundy (rear driver side), 18-year-old Victoria Sharpe (middle back seat), and defendant Shawna Cox (rear passenger side). Ms. Cox video-recorded the events that transpired using her smart phone.[5]

Law enforcement urged Finicum from the vehicle but he declined. Mr. Payne put his arms out the passenger side window in a show of compliance, and he was shot in the arm with a projectile. He subsequently stepped from the vehicle and was arrested without further incident. Finicum took a different approach, stating that he was going to

---

[5] See www.oregonlive.com/oregonstandoff/2016/03/oregon_standoff_fbi_lie_uncove.html.

Page 4 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

go meet with the Sheriff of Grant County. Eventually, he sped away with his three passengers. Law enforcement vehicles gave chase.

A couple miles later, Finicum rounded a bend in the road and came upon the roadblock. As Finicum approached the roadblock, OSP troopers fired lethal rounds at the engine block and at Finicum. Two bullets struck the front of the vehicle and a third hit the driver's side mirror. Finicum pulled his vehicle to his left and it became lodged in a snow bank on the shoulder of the road. Finicum stepped from his vehicle with his arms extended. He waded into the deep snow several feet to the west of the pick-up truck. Moments later, OSP troopers shot and killed Finicum. The troopers claimed that they believed he was reaching for a firearm in his left breast pocket.

Law enforcement ordered the remaining occupants of the truck to get out. Fearing they would be shot like Finicum, the occupants did not immediately exit the truck. The troopers fired non-lethal rounds, including gas, into the cab, breaking the front passenger side window. Ryan Bundy, Ms. Sharpe, and Ms. Cox emerged from the truck and were taken into custody without further incident. Ryan Bundy suffered a bullet wound to his right shoulder.

The Tri-County Major Incident Team, led by the Deschutes County Sheriff's Office, conducted the investigation into the officer involved shooting. Heavily redacted reports of this investigation have been provided in discovery. The unredacted parts provide some insight into important protocols and procedures that must be followed whenever officers discharge their weapons -- procedures that take on even greater significance when the discharge results in death. For example, the OSP troopers who discharged their weapons recognized the firearms had evidentiary significance. Therefore, they presented them to other troopers present at the scene who then secured them as evidence. Also, the troopers understood that the roadblock had

Page 5 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497


become a crime scene. After it was secured, they accordingly treated it as such. As the investigation unfolded, for example, the locations of shell casings were recorded.

However, not all law enforcement officials understood these responsibilities or took them seriously. The troopers' accounts of the shooting incident did not explain a bullet hole in the roof of Finicum's pick-up that indicated a trajectory extending through the rear driver's side window. Also, the video from Cox's cell phone showed the rear driver's side window exploding from a gunshot at the very moment that Finicum stepped from his vehicle with his arms extended outwards. Investigators also were piqued by a trooper's statement that, before the scene was processed, he saw shell casings from non-OSP issued ammunition on the ground. These shells were not found by the crime-scene investigators. Finally, the aerial FBI surveillance video of the scene shows FBI HRT operators searching an area with flashlights and huddling. One agent is seen bending over twice as if to pick something up.

Ultimately, the Deschutes County Sheriff concluded that:

1. Two shots were fired at Finicum's truck by one or more members of the FBI HRT team present at the roadblock. One of those shots penetrated the roof and shattered the rear driver's side window. The other shot missed its target.

2. The FBI HRT team members lied to investigators on January 26, 2016, by denying they had discharged their weapons.

3. The FBI HRT team members lied to investigators on February 5 and 6, when they again denied having discharged their weapons.

4. The FBI HRT team members engaged in other conduct that the Deschutes Sheriff described as "specific actions they took after the shooting which are the subject of an ongoing investigation" – a thinly disguised reference to the agents' conduct in picking up their brass following the shooting.

Page 6 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

The Deschutes County Sheriff determined that the OSP troopers were justified in shooting Finicum. However, the sheriff *did not* determine that the FBI HRT agent was justified in discharging his weapon, and that question remains to be determined in the Tri-County Major Incident Team investigation and the OIG inquiry.

The discovery does not include the interview reports or transcripts of the FBI HRT operators' false statements to the investigators. Their names and field offices from which they came also are not revealed. One trooper described the FBI HRT members as mysterious and expressed doubt whether they used their true names even with other law enforcement.

The interviews provided in discovery reveal that the FBI HRT squad had a significant operational presence in the Burns area as early as December, *i.e.,* before Bundy *et al* took up residence at the refuge. It is not clear from the discovery how many FBI operators were engaged in the refuge matter, but one report mentions a "convoy" of HRT members traveling from Burns, Oregon to Boise, Idaho -- or from Boise to Burns (the report is inconsistent) -- on January 26, the day of Finicum's death.

## Argument

The OIG investigation into the FBI HRT operators' conduct must be produced in discovery in order to vindicate defendants' fundamental trial rights of Due Process, Compulsory Process, and Confrontation under the Fifth and Sixth Amendments to the United States Constitution. *See Brady v. Maryland*, 373 U.S 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972). Underlying those important rights is the right of transparency and fairness. Defendants Ryan Bundy and Ms. Cox have a right to know why agents of the federal government fired lethal rounds at them, why the agents repeatedly lied about it, and why they removed evidence of their conduct. All defendants have a right to information that will establish the bias and hostility of federal

Page 7 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

agents, that will support claims of self-defense, and that will generally explain defendants' conduct as rooted in fear rather than aggression.

Evidence that impeaches the credibility of a law enforcement official must be produced in discovery pursuant to *Brady* and *Giglio*. *See Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) (habeas relief granted when the state suppressed evidence of detective's long history of lying under oath and other misconduct). Evidence of a witness' bias or interest also must be disclosed. *See United States v. Bagley*, 473 U.S. 667 (1985) (referring to bias and interest arising from inducements offered to government witnesses). Surely, evidence that FBI HRT operators shot at defendants and then lied about and covered up the shooting is admissible to show their bias and hostility against the defendants. Therefore, the government must produce all evidence that relates to the incident and that bias.

The government will attempt to moot the issue by stating that none of the FBI HRT operators currently under investigation will testify at trial. However, it is not clear at this point that even the prosecutors know the identities of the operators under investigation. FBI HRT agents were involved in several operations relating to the refuge occupation over roughly a two month period, and any of them called to the stand to testify about other matters could very well have been involved in the shooting and cover-up, either as direct participants or after-the-fact facilitators. Also, FBI HRT agents double as line agents when not pressed into high risk duty. For all we know, these same agents were involved in the criminal investigation and will testify about their roles in other capacities. At the very least, the defense needs to know whether any testifying FBI agent had any involvement whatsoever with the Finicum shooting or the aftermath.

The FBI's use of excessive force and subsequent cover-up also is admissible to demonstrate the agency's institutional bias and hostility against defendants and their supporters. The jury must understand this bias in order to assess the credibility of all

Page 8 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

FBI agents called to the stand regardless of their direct involvement in the shooting. This bias and hostility also will help the jury understand the core motivating factors that brought several of the defendants to the refuge.  They had become fed up with just this sort of federal arrogance, overreach, aggression, and corruption.  Nothing could bring home that point more strongly than an event portraying all of those negative characteristics of the US government in microcosm.  While a man lay dead in the snow, federal agents with a greater concern for their reputations than the grave matter at hand conspired to hide evidence of their discharge of weapons.  The FBI has demonstrated its contempt for defendants' fundamental constitutional rights in other aspects of this case.  For example, the agents who transported Mr. Fry from the refuge to Bend following his arrest purposefully ignored his attorneys' invocation of his Fifth and Sixth Amendment rights and interrogated him at length.  The FBI's pattern of conduct demonstrates an attitude of being above the law and not accountable to anyone.  This attitude is relevant to assessing the credibility of the agents' testimony.

The FBI's excessive use of force and subsequent cover-up is admissible also to support defendants' position that they possessed firearms in response to their perception of an increase in law enforcement personnel and combat equipment in the Burns area in the days before and during the occupation of the refuge.  Defendant Ritzheimer separately is moving to compel discovery of this build up.  This information is material and helpful to the defense claims of self-defense and to explain that defendants possessed guns because they feared an FBI assault, not because they intended to prevent BLM or Fish and Wildlife employees from coming to work. Evidence of use of excessive force in the Finicum shooting and the cover-up scheme is material and helpful to corroborate and substantiate those fears of FBI violence.  *See generally United States v. Span*, 970 F2d 573 (9th Cir. 1992) (defendant who claims officers used excessive force that caused defendant to assault officers would be entitled to instruction

Page 9 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497

on self-defense and excessive use of force), *post-conviction relief granted in*, 75 F.3d 1383 (9th Cir. 1996) (defendant's counsel provided ineffective assistance of counsel by failing to request instruction on self-defense and excessive use of force and failing to establish foundation for excessive force defense).

Finally, with respect to Mr. Fry and the other defendants who camped out in the parking lot of the refuge and who refused orders to leave after January 26, the FBI's use of force and its cover-up is relevant and helpful to explain these defendants' fear that they would be assaulted by law enforcement. These individuals did not specifically know that an FBI agent had lied about shooting at Finicum or that they tampered with evidence. However, they did know that Finicum had been shot and killed by law enforcement, and they believed that the killing was unjustified. They feared they would meet the same fate. The evidence sought here will help establish the reasonableness of that fear, and would help to show that their actions in taking up arms and holding out were fear-driven rather than in furtherance of a conspiracy.

## Conclusion

For the foregoing reasons, defendants seek an order compelling the government to produce the reports of the OIG investigation and of the Tri-County Major Incident Team relating to the FBI HRT operators' use of force, false statements, and tampering with evidence.

DATED this 14th day of June, 2016.

                              HOEVET OLSON HOWES, PC

                               *s/ Per C. Olson*
                              Per C. Olson, OSB 933863
                              Attorney for Defendant David Fry

Page 10 – MEMO IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL

HOEVET OLSON HOWES, PC
ATTORNEYS AT LAW
1000 S.W. BROADWAY, #1500
PORTLAND, OREGON 97205
(503) 228-0497