Jason Patrick, Pro Se
c/o Andrew M. Kohlmetz, OSB #955418
Kohlmetz Steen & Hanrahan PC
741 SW Lincoln Street
Portland, OR 97201
Tel: (503) 224-1104
Fax: (503) 224-9417
Email: andy@kshlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 3:16-CR-00051-BR-09 |
| Plaintiff, | ) |
| | ) DEFENDANT'S MEMORANDUM OF LAW |
| vs. | ) IN SUPPORT OF MOTION FOR CHANGE |
| | ) OF VENUE: PRESUMPTIVE PREJUDICE |
| JASON PATRICK, | ) |
| Defendant | ) |

The defense was given leave to file this Change of Venue Motion in "Round Two" because my indigent funding request for a change of venue analysis was still pending at the time "Round One" motions were being filed. Since that time, my defense has been denied funding for a comprehensive compilation and analysis of the pretrial publicity in this case that my standby counsel viewed as necessary to the bringing of a proper Change of Venue Motion. (See Documents # 524-526, 574, 576). I understand that this court has allowed leave to refile a request for funding for a change of venue analysis at the close of voir dire. With this in mind, I seek now a change of venue preliminarily on the ground that due to the nature, content and amount of pretrial publicity herein, prejudice within the district-wide jury pool must be presumed and therefore a change of venue is required. I ask further to be allowed to raise "actual prejudice as a ground for similar relief once jury selection is underway and juror exposure to pretrial publicity can be assessed individually. Lastly I request leave of the court to supplement this Motion and Memorandum with additional examples of pretrial publicity as my investigator is able to prepare them.

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CHANGE OF VENUE 1

The Sixth Amendment guarantees a defendant a right to a jury trial before a fair and impartial jury. Due Process requires that a trial court order a change of venue when the court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere." *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988) (citing *Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)). A defense motion for change of venue based on Sixth Amendment concerns is governed specifically by Federal Rule of Criminal Procedure 21(a) which provides:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

The existence of two types of prejudice may be offered in support of a motion for change of venue: presumed or actual." *United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir.1996). Presumed prejudice exists when "the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris,* 885 F.2d at 1361. Actual prejudice exists when members of the jury pool are actually partial or hostile to the defendants and that partiality or hostility cannot be set aside." *Id.* at 1363. This Court has repeatedly expressed the belief that prejudice cannot be presumed in this case. (*see for example*, Transcript of May 4, 2016 case status hearing, Order on Defendant's Amended Motion for Indigent Defense Funds, Document 576) I believe this judgment premature if not erroneous.

The court must consider four factors in determining whether prejudice in the jury pool must be presumed as a result of pretrial publicity, the first three of which are relevant at this juncture: (1) the size and characteristics of the community in which the crime occurred; (2) whether the news stories contained confessions or other blatantly prejudicial information that viewers could not reasonably be expected to ignore; and (3) the delay between news stories and trial; *Skilling v. United States*, 541 U.S. 358, 381-83, 130 S.Ct. 2896, 177 L.Ed.2d. 619 (2010), *see also Williams v. Franke*, No. 6:01-CV-00812-AA, 2013 WL 3819868, at *2 (D.

Or. July 22, 2013) *aff'd,* 590 F. App'x 691 (9th Cir. 2015). The court must review the proffered media reports for "volume, content, and timing to determine whether prejudice exists. *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir. 1988). Furthermore, the finding of whether or not presumed prejudice exists is made without reference to any examination of the potential jurors themselves. *See Rideau*, 373 U.S. at 727. Prejudice will be presumed if there is a finding made that "the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris,* 885 F.2d at 1361.

The first "Skilling factor" is the size and characteristics of the community. Because the jury pool will be drawn from all divisions within the District of Oregon, the potential jury pool from the entire District is the relevant community for a change of venue analysis. *Skilling, 541 U.S. at 382.* As of 2015, there were 4,028,977 persons living in Oregon.[1] Voter registration is the primary criteria for federal jury service eligibility in this District. As of May, 2016, there were 2,309,829 registered voters in Oregon.[2] Thus, the relevant community size is roughly 2.31 million persons. However, this number is certainly reduced in fact by how many of those potentially eligible jurors appear on the Clerk's current list. Regardless, based on the partial media compilations I have amassed to date, it is clear that the entire community has been exposed to pretrial publicity concerning this case.

The second of the four "Skilling Factors" that the court must examine in analyzing whether extensive pretrial publicity has resulted in presumed prejudice is "whether the news stories contained confessions or other blatantly prejudicial information that viewers could not reasonably be expected to ignore" *Skilling, 541 U.S. at 382*. This is the critical factor in this unique case. There was extensive media coverage of the events leading up to the January 2, 2016, entry onto the Malheur National Wildlife Refuge ("MNWR'). There has been extensive local media coverage since, including media updates after every hearing in this case.[3] What makes this case remarkable and unique in many respects is the coverage of the occupation as

---

[1] http://www.census.gov/quickfacts/table/PST045215/41
[2] http://sos.oregon.gov/elections/Documents/registration/May16.pdf
[3] See for example, http://www.oregonlive.com/oregon-standoff/2016/06/judge_dismisses_one_of_the_gun.html (reporting on dismissal of count 3, 1156 comments as viewed June 13, 2016)
http://www.oregonlive.com/oregon-standoff/2016/05/defense_lawyers_signal_push_fo.html (reporting on the May 4, 2016 status conference. Over 730 comments. as viewed 5/9/2016. http://koin.com/2016/05/06/malheur-refuge-standoff-the-ranchers-story/ ( 5/6/16 opinion piece as viewed 5/9/2016)

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CHANGE OF VENUE 3

it occurred. For almost the entire period of 41 days in which some of these defendants are accused of occupying the Refuge and committing various criminal acts in that regard, there was a constant stream of media coverage in real time and on both traditional and social or electronic media platforms amounting to nothing short of a live broadcasted commission of the alleged acts and confessions thereto.

The volume of ongoing media coverage pertaining to this case has been extreme. For example, on June 8, 2016, a simple search of the term "Bundy Standoff" on the Oregonlive.com website produces "about 52,100" results, a broader Google search of the same term produces "about 408,000" results generally and "about 26,100" results under the Google "news" heading. An Oregonlive.com website search of the term "Oregon standoff" produces "about 114,000 results.Oregonlive.com is the electronic front for Portland's major newspaper, The Oregonian. According to the Oregon Media Group's website the Oregonian and its electronic counterpart Oregonlive.com reach a broad swath of the state's populace.

> More than 1.1 million readers choose The Oregonian for in-depth local news every month. OregonLive draws 4.6 million monthly visitors, supported by national networks and partners that reach millions more.[4]

Anecdotal review of hundreds of media articles and on-line posts related to the MNWR protest leads me to conclude that the media coverage of this event is unprecedented in both scope and nature. The sheer number of articles produced locally is in the thousands. On-line commenting to many of these stories by the general public appears to be widespread. The overall tenor of the comments appears to be overwhelmingly hostile and negative in nature. Popular hashtags such as #talibundy, #yallqueda, #yokelharam and others appear across many articles and social media platforms. A common theme appears to be the popular equation of the MNWR protesters with domestic terrorists. Expressions of the predetermined guilt of these defendants are replete in such comments.

Because this Court denied my earlier request for funding to complete a comprehensive media survey and analysis, I am unable to offer here a complete accounting of all media coverage of the events as they unfolded at the Refuge. Nor can I quantify, by attitudinal survey data, the full reach and impact of that media coverage. However, standby

---

[4] http://www.oregonianmediagroup.com/business-solutions/why-oregonian-media-group/ as viewed 03/28/16

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CHANGE OF VENUE 4

counsel has provided me with reports of work currently being performed by my defense investigator. These reports indicate that during the first week of the so-called occupation, between January 2nd and January 8th 2016, 86 separate written articles concerning the "occupation" were posted on Oregonlive.com.[5] These articles were the subject of an extreme amount of publicly posted commentary. This type of commentary, relatively new to electronic media is illustrative of the impact these stories have had on the community. Even a casual perusal of the comments from the stories listed in Exhibit A and elsewhere available online reveal a tone of marked hostility and prejudgment as to these defendants.

A high volume of coverage also appeared in Portland metro area television outlets. During the month of January, 2016, I have identified 566 television news stories which were broadcast in the Portland TV market concerning the facts at the heart of this case.[6] Radio coverage was also extreme. From the month of January 2016 I have identified 1,422 radio broadcasts concerning the Refuge "occupation."[7] These reports included almost daily broadcasts from the Refuge itself and included photographs, videos, and personal interviews of some of the defendants concerning what was occurring and why. Some defendants held news conferences, while others broadcast audio and video on social media websites which were then picked up and retransmitted by mainstream media outlets. Many of the defendants were named, interviewed and even profiled. The coverage of the events unfolding on the Refuge and the people involved with those events was unrelenting and pervasive. Without funding for my previously requested media analysis I cannot at this time offer more than the attached .pdf summaries of the pretrial publicity. However, review of these summaries suffices to show both the volume and content are problematic.

Unlike the case in *Skilling*, or in other cases where the media coverage begins after the alleged criminal acts have been committed, the media coverage here is of the most extreme and prejudicial nature that one can imagine: Far more similar to the cases from

---

[5] Exhibit A: PDF report of Oregonlive.com articles and public commentary under hashtag "Oregon standoff" prepared by Defense Investigator Mark R. Robertson.
[6] Exhibit B: PDF summary report of Portland area television coverage of the events occurring at the MNWR during the month of January, 2016. Prepared by Michael James of Yournews, Inc., a local mass media amalgamator.
[7] Exhibit C: PDF summary report of Portland area radio coverage of the events occurring at the MNWR during the month of January, 2016. Prepared by Michael James of Yournews, Inc., a local mass media amalgamator.

which the *Skilling* court drew great pains to differentiate.

> although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type
> readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. Cf. *Parker v. Randolph,* 442 U.S. 62, 72, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979)
> (plurality opinion) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." (internal quotation marks omitted)). Pretrial publicity about Skilling was less memorable and prejudicial. No evidence of the smoking-gun variety invited prejudgment of his culpability. See *United States v. Chagra,*
> 669 F.2d 241, 251–252, n. 11 (C.A.5 1982) ("A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.").

*Skilling*, 561 U.S. at 382-83. For 41 days Oregonians awoke to daily live factual and editorial updates of what was occurring at the Refuge. These were direct reports often accompanied by statements of the defendants herein. This type of coverage is unusually and extremely prejudicial to the defendant's presumption of innocence. Thousands, of Oregonians watched the commission of these offenses at some point on television and social media outlets. Thousands of Oregonians listened at some point to daily updates on radio and television outlets such as OPB. Thousands of Oregonians read the daily updates in the Oregonian newspaper's print and electronic editions. Many posted comments to such articles. Thousands of Oregonians were further exposed to other print, audio, video and social media.

    Media stories and broadcasts from the Refuge in particular were constant "evidence of the smoking gun-variety" which invites prejudgment of the guilt of these defendants. Dozens of persons, codefendants and otherwise, appeared in traditional and social media audio and video broadcasts describing and documenting in detail the alleged commission of these offenses.  These were not simply stories about the event, they were part of the event itself and moreover contained the personal statements, involvement, and even past histories of many of these defendants. That bell cannot be unrung. The facts underpinning *Rideau* are

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CHANGE OF VENUE 6

instructive. Wilbert Rideau was arrested a few hours after robbing a bank, abducting three employees and killing one.

> The next morning a moving picture film with a sound track was made of an 'interview' in the jail between Rideau and the Sheriff of Calcasieu Parish. This 'interview' lasted approximately 20 minutes. It consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder. Later the same day the filmed 'interview' was broadcast over a television station in Lake Charles, and some 24,000 people in the community saw and heard it on television. The sound film was again shown on television the next day to an estimated audience of 53,000 people. The following day the film was again broadcast by the same television station, and this time approximately 20,000 people saw and heard the 'interview' on their television sets. Calcasieu Parish has a population of approximately 150,000 people.

*Rideau*, 373 U.S. at 374. Somewhere between 1/3 and 2/3 of the people in the Parish of Calcasieu from where the jury was drawn had been exposed to at least one of these broadcasts. Though three of the twelve jurors who convicted Rideau had seen at least one of the broadcasts, the Court did not proceed to an analysis of the lower court's voir dire process. According to the Court, the public spectacle of Rideau's unorthodox pretrial confession compelled a change of venue:

> it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Rideau,* 373 U.S. at 726. This case is similar to Rideau in its uniqueness. Yet, in one very real sense it is worse. In addition to hearing and seeing what amounts to virtual confessions of some of these defendants given in interviews and news conferences during the so-called occupation, thousands if not millions of Oregonians were exposed to broadcasts of actual commission of the alleged criminal acts themselves. Would the result in Rideau had been any different had, in addition to his taped confession, the prospective jurors been exposed to a broadcast of the bank robbery, kidnapping and murder itself? It is the content and nature of

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CHANGE OF VENUE 7

the media coverage in this case, in conjunction with the volume of coverage, that compels a finding of presumed prejudice.

Moreover, the media coverage of this case continues. Although perhaps without the frequency and flamboyancy it had during the events at issue, there are almost daily media reporting concerning this case to this day. There has been almost non-stop media coverage of this case beginning in the late Fall of 2015, continuing through the developing protests in Burns, Oregon in late December, through the actual "occupation" of the MNWR in January of 2016, and continuing to this day in regard to developments in the criminal investigation and court cases as they occur. In essence, and unlike traditional after-the fact-media coverage of typical criminal acts, the coverage in this case was ongoing as the occupation and alleged criminal acts were being committed. In a very real sense the commission of the criminal acts alleged in the Superseding Indictment were widely broadcast throughout Oregon and beyond in real time as they were occurring. Oregonians are served up an almost daily reminder of this case in a variety of print and electronic media. There is now even an entire detailed Wikipedia page devoted to the events which are at the heart of this case entitled "Occupation of the Malheur National Wildlife Refuge" which can be viewed online at https://en.wikipedia.org/wiki/Occupation_of_the_Malheur_National_Wildlife_Refuge. Oregonians are treated to daily media reminders of what transpired at the Refuge. There continues a very real danger that this extra-evidentiary coverage continues to taint the public perception of this case and these defendants.

These daily reminders of the "so-called" occupation lead to analysis of the third relevant "Skilling factor;" The delay between the media coverage and the trial. The "occupation did not end until February 11, 2016 when codefendant David Fry, in rather flamboyant and publicly broadcast fashion, livestreamed the process of his "surrender" to the FBI. [8] Trial is now set to begin on September 7, 2016, Not fully seven months after the media broadcasts of the continuing "occupation" and its participants ceased and well before the continuing media coverage has died down. Given the extensive amount of pretrial publicity and its unique and prejudicial content, not enough time has passed to ensure that the biasing

---

[8] See http://www.npr.org/sections/thetwo-way/2016/02/11/466394039/listen-final-occupier-refusing-to-leave-oregon-wildlife-refuge (as viewed June 13, 2016).

effects of this media coverage have abated. Without both the media analysis and community attitude survey for which I had requested funding, I am incapable of quantifying this claim. The Court should therefore err on the side of caution and find that prejudice must be presumed in the District.

The court cannot simply state it is of the opinion that "this is not a case where prejudice can be presumed." It must consider the pretrial publicity before rendering its decision. As noted in *Rideau*, reliance on the voir dire process is not the legally appropriate avenue by which to analyze presumptive prejudice.

    For these reasons, and those raised in my request for indigent funds for a change of venue analysis and exhibits thereto this court should grant the instant motion. In the alternative I renew my request for funding of a change of venue analysis, and request a continuance of the pending September 7, 2016 trial date to accommodate a properly evidenced and litigated Motion for Change of Venue.

RESPECTFULLY SUBMITTED THIS 15th day of June, 2016

                                                                          _Jason Patrick_
                                                                          Jason Patrick, Pro Se