Anthony Clark Schwartz
Email: tonyschwartz.law@gmail.com
The Schwartz Law Firm
520 SW 6th Avenue, Suite 600
Portland, OR 97204
Tel: (503) 224-0678
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| UNITED STATES OF AMERICA, | CR No. 3:16-CR-00051-BR-03 |
|---|---|
| PLAINTIFF, | |
| v. | DECLARATION OF JOSEPH O'SHAUGHNESSY IN SUPPORT OF HIS MOTION TO WITHDRAW GUILTY PLEA |
| JOSEPH O'SHAUGHNESSY, | |
| DEFENDANT. | |

I, Joseph O'Shaughnessy, declare:

1. I am the defendant in this case.

2. I am also the defendant in the Nevada case with case number 2:16-cr-00046-GMN-PAL.

3. I am 44 years old, of sound mind, and competent to testify to the matters in this declaration.

4. I have spoken with my current lawyer (Tony Schwartz) multiple times by telephone about my motion to withdraw guilty plea. I have also spoken with him in-person on January 14, 2017 for nearly five hours when he visited me in the Nevada Southern Detention Center where I am awaiting my trial in the Nevada case. I have

Page 1 DECLARATION OF JOSEPH O'SHAUGHNESSY

explained to him the details of the Oregon case, the Nevada case, and the circumstances surrounding my motion to withdraw guilty plea.   What follows is true.

5.    Regarding this Oregon case, I am innocent of the single conspiracy charge.

6.    During the events in Oregon, I never broke federal or state laws regarding trespassing.

7.    I did not participate in or approve of the Oregon occupation, but did support the message, which I told Judge Brown at my change of plea hearing.

8.    During the Oregon occupation, my goal was to provide a peaceful atmosphere between both parties.   As a former firefighter/paramedic, I and other licensed medical professionals set up a medical tent at "The Narrows" – an RV park about 7 miles from the Malheur County Wildlife Refuge – because 9-1-1 emergency services had been shut off.

9.    I was actively trying to get the Bundy brothers and others out of the refuge since they had made their point about the Hammonds through the national press.

10.   I believe that I was politically targeted since I had a prior relationship with the Bundys before this case.   I had never been convicted of a felony before this case, and my only misdemeanor was a "dog-at-large" ticket.   For over 11 years, I served as a firefighter/EMS in the Chicago, Illinois area.

11.   During the Oregon occupation, while on my way to get pizza and beer in Burns, Oregon, I was arrested by Oregon State Police on a warrant related to this case, and later transported to Portland, Oregon.

12.   My former lawyer (Amy Baggio) and I soon thereafter began my defense of the case.   I felt very good about the case and we were heading toward the September 2016 trial date.

13.   In early March 2016, while on pre-trial release in Arizona, I was arrested and charged with crimes related to the Nevada case.   The Nevada judge denied me release so the US Marshals transported me back to Portland where I started again on my defense of the Oregon case while remaining in jail.

14.   At that time, I was totally focused on the Oregon case, and I put my Nevada case on the back burner.   Over the next four months or so – in April, May, June and July – I prepared for trial in Oregon.   I had no discovery in Oregon from my Nevada case. And, before my change of plea in this case, I had talked with my Nevada lawyer about 6 times by telephone, and each call lasted 15 minutes, which was the maximum amount of time allowed for each call.

15.   In the summer of 2016, my mother suffered a stroke in Cottonwood, Arizona. Before my arrest in this case, I lived with my mother and was her primary caregiver. Her medical condition caused me extreme concern and stress.

16.   The very next day after my mother's stroke, sometime in July 2016, Ms. Baggio approached me with a plea that I understood was a "global deal" or a resolution for both cases at the same time.   My understanding was that the charges in Nevada carried mandatory minimum time and that if I lost at trial I would get 94 years in prison, but that if I settled the case I would get no more than 72 months, and that whatever I got in Oregon would run concurrently with Nevada.

17.   However, I was told that I could only get the Nevada resolution if I pled guilty to the Oregon case.   I was innocent of the Oregon case and felt coerced and under duress.   Plus, Ms. Baggio told me that I only had five days to decide whether to accept the resolution or not.

18. At the time that Ms. Baggio approached me with the "global deal" I had not seen any of my Nevada discovery except for a handful of photographs that Ms. Baggio gave to me.

19. During this five day period, I spoke with my Nevada lawyer twice by telephone for 15 minutes each. She told me during those two calls that she had "less than half" of the Nevada discovery. She was unsure about her advice to me given her lack of knowledge about my Nevada case.

20. In the meantime, the Nevada prosecutor was communicating with Ms. Baggio and telling Ms. Baggio how much time I would get if I lost at trial in Nevada, and how strong the case was against me. Ms. Baggio told me what the Nevada prosecutor told her, but I still had no way to evaluate my Nevada case.

21. During this five day period, I was confused, scared, and under extreme emotional disturbance because of my mothers' stroke. I was not thinking clearly. I felt like I was being blackmailed and that if I did not accept the "global deal" that I would never get out of prison, and never see my mother again or my 6 year old daughter. In fact, during this time, I called friends, family and Nevada State Assemblywoman Michelle Fiore and told them I was being blackmailed by the prosecutor into entering a "global deal."

22. I agreed to the "global deal" because my understanding was that I had to plead guilty in Oregon or there was no Nevada deal. So I went forward with the deal. I never received an offer to plead only in the Nevada case or to plead only in the Oregon case. The only offer I ever received was to plead to both cases under the package "global deal."

23. When I returned to Nevada, I was finally able to review my discovery in that case, and I now realize how weak the case is in Nevada (just like Oregon's case). Again, before my plea with Judge Brown, I had only seen a handful of photographs from the Nevada discovery, which now totals more than 2 terabytes of digital information.

24. I now realize that Ms. Baggio misled me with regard to the "global deal." I was led to believe that all the prosecution had to do was bring in a BLM agent and have that person say that he or she felt threatened or intimidated and a jury would convict me. Ms. Baggio also made comments about how strong the Nevada case was against me which caused me great concern especially since I did not have access to discovery in the Nevada case. She presented me information fed to her from AUSA Knight or the Nevada AUSA about both Oregon and Nevada, which I later realized and concluded were not true. She told me that there were audio recordings of me commenting in support of the refuge occupation, or that I was a willing participant in the refuge occupation, that would convince a jury to find me guilty. There are no such recordings. Finally, Ms. Baggio referred to the Oregon-Nevada deal as a "global resolution" or a "global deal" when it turns out not to be global at all.

25. These comments caused me to enter into the settlement with the Oregon and Nevada prosecutors. The comments that she made I believe were untrue and caused me to accept the "global deal."

26. Most importantly, my understanding was that I had to take a plea in Oregon and Nevada for the resolution to be binding. Indeed, the Nevada case was discussed by Judge Brown, and the prosecutor, and Ms. Baggio at my plea hearing before Judge

Brown. Judge Brown even asked me if I understood that the two cases were related and connected.

27. When I got back to Nevada, after reviewing the Nevada discovery, I realized that I had been misled with regard to the strength of the Nevada case, and rejected the Nevada settlement of 72 months. Now I know that I have been tricked and blackmailed because the Oregon prosecutor is opposing my motion to withdraw my guilty plea.

28. I clearly told Judge Brown that I did not participate in the occupation of the refuge.

29. I believed that if I decided not to take the plea in Nevada that I would able to revoke my plea in Oregon and go to trial. My understanding was that it was a "global deal" and that both a plea in both Oregon and Nevada was required . Ms. Baggio told me several times that the resolution was "global" and we talked about the Nevada case several times at my plea hearing.

30. I now understand that the Oregon prosecutor is saying, in the response to the motion to withdraw guilty plea filed by my lawyer, that my signed plea letter specifically noted that the Nevada was not a party to the "global deal." Regardless of that legal language, my understanding was that Nevada, Oregon and myself were all part of the "global deal." I had to plead guilty in Oregon to get the Nevada deal, and the Oregon sentence would simply track whatever the sentence in Nevada was, so it seemed to me that it was all interconnected.

31. I also understand that the Oregon prosecutor considered the Oregon plea "independent" of the Nevada plea. Again, regardless of the narrow legal significance of the plea letter, my understanding of the agreement was that it was "global" and that both pleas were connected.

32. My unequivocal understanding was that, regardless of whatever the plea letter says or does not say, I had to plead guilty in Oregon to get the deal in Nevada, and that if I rejected the deal in Nevada, I could also reject the deal in Oregon.

33. If the plea letter does say something different, I did not understand its legal significance or what the Oregon prosecutor says its legal significance is now.

34. This whole ordeal has taken a great toll on me physically and mentally. Never in my life would I ever believed that obeying the oath I took to defend my neighbor and the United States Constitution would put me in this situation.

35. Being given 5 days to decide between the threat of 94 years in prison or taking a plea in Oregon and Nevada was unfair and way too much for me to handle especially given my mother's medical condition.

36. While in Oregon, I was living at "The Narrows" the entire time. I actively encouraged others to leave the refuge once our point regarding the Hammonds had been made. Indeed, my whole point in traveling to Oregon was to get the federal government to do its job in protecting this country. I am factually innocent of the Oregon conspiracy charge.

37. I ask that Judge Brown allow me to withdraw my guilty plea. I request a trial by jury of my peers so that justice can be served and I can prove my innocence.

38.    I am prepared and ready to go to trial on February 14, 2017 with trial group 2 in Oregon.

DATED this January 19, 2017

> I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THEY ARE MADE FOR USE AS EVIDENCE IN COURT AND ARE SUBJECT TO PENALTY FOR PERJURY.
>
> <u>s/ Joseph O'Shaughnessy</u>
> Joseph O'Shaughnessy